The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attendance, and they shall be heard. God save the United States of America and this Honorable Court. Good morning. Please be seated. Court is in session. Today's cases will be called as previously announced, and the times will be as allotted to counsel. The first case today is 23-1761, Hornof v. United States. Counsel? Your Honors, and may it please the Court, it's my pleasure to represent these fine former seafarers. All of them have given up their seafaring career as a result of their treatment by the United States and the distress that they suffered, as a result of an extraordinary practice developed by some Coast Guard officers and some Department of Justice lawyers to prosecute, here in America, foreigners for their high seas record-keeping concerning the handling, mishandling of bilge water. None of these gentlemen were involved in the record-keeping. Mr. Hornof discovered the chief engineer on the Margarita engaging in improper discharges on the high seas, and as far as I know, is the only example in the history of this marvel prosecution by the government, who immediately shut down the pollution, reported it directly to the captain, confronted the chief engineer, reported it to MSD, and caused it to end. MARPOL, of course, is enforced in America by the Act to Prevent Pollution from Ships, APPS, and MARPOL and APPS include detailed requirements for record-keeping. In MARPOL, in Regulation 17 in Annex 1, it's expressly adopted in APPS. There's no suggestion in the case that the vessel had violated APPS or MARPOL. The Coast Guard, 40 years ago, adopted regulations intended to reiterate those regulations, but they made a subtle change, changing the word keep three times in Regulation 17 to the word maintain, and they contend that that gives them jurisdiction that the international community refused to give the United States, that Congress refused to assert, to prosecute high seas record-keeping. That's how the case got started. Mr. McCall, it would help us if you could focus in on what error you believe that the district court made that we should reverse or vacate. Yes, Your Honor. So the district court concluded that that change in the regulation, adopting the word maintain, allows the United States to prosecute high seas record-keeping. This case is unique in a couple respects in that regard. It's the only prosecution I'm aware of where the government never contended or alleged, and in fact, never reviewed or was presented with the record book until after it was corrected. So we believe, we respectfully contend that that's the first error the district court made. And on that point, wasn't that ruling by the district court a necessary predicate to your client, Mr. Hornoff, receiving over $200,000? The conviction of the defendant was a necessary predicate to the APPS award, Your Honor. And your client supported that conviction and received and accepted the money and has not tendered it back. Our clients always contended, Your Honor, that the U.S. prosecution was improper and the APPS didn't apply. But they also always agreed they would meet any time the government wanted, answer any questions the government had, as long as they weren't held here, and would return for trial, which they did once and were about to do a second time after Judge Torreson rejected the plea agreement. The other errors of the district court, Your Honor, are in resolving a disputed fact. Before you leave this one, just one point of clarification, if I may. I thought that the port country has the authority to prosecute violations, and isn't the maintenance of the log book an ongoing obligation? So how do you address that? Yes, Your Honor. So as opposed to being a high-seize violation. Right. So Marple and APPS made clear that the entries have to be accurate. What several courts have concluded is that changing the word keep, keep the record book for three years, and keep it in a place that's available for inspection, to the word maintain, and the assertion of vision that the master is responsible for the maintenance of the book, essentially creates a continuing violation, changes what is a static violation that is completed when an incorrect entry is made on the high-seize to either a continuing violation or a springing violation. That means every place you go with that record book, at least every time you come into this country, because it's a regulation peculiar to us, there's a new violation. And respectfully, Your Honor, Congress did not authorize the Coast Guard to change the balance of enforcement. Why is it a new violation and not just a continuing violation? Because there's nine counts in the indictment. Eight counts in the indictment for every time the vessel came or went from the United States. So it's a springing offense according to the way the Coast Guard has interpreted its regulation. As we explain in detail in the brief, Your Honor, the regulation existed for 20 years before the Coast Guard, it even occurred to the Coast Guard they could adopt this interpretation. And when they promulgated the regulation, they specifically said the record book requirements are nothing new, and the regulations are designed to prevent pollution by U.S. ships everywhere, and by foreign ships while they're here. They were not designed and not intended to give us jurisdiction to fight high seas events. And what's really frustrating for these crew members, Your Honors, is that because we've decided to bypass the system of international enforcement through the flag state concerning what happens on the high seas, now we created a procedural morass for ourselves. How are we going to investigate it? Let me ask you this hypothetical. If the logbook had absolutely accurate and detailed entries with respect to this incident, and just before entering U.S. coastal waters, a decision was made to wipe that clean, you're saying the port country, the U.S., could not prosecute that violation because it occurred on the high seas? If records were destroyed immediately before entering the United States, I don't think it's an ABS violation, but I think it's a violation of U.S. law. That would be the destruction of records with the intent to obstruct the Coast Guard investigation if it were done for that purpose, Your Honor. If the discharges had been accurately recorded on the high seas, and the book had come into the United States with accurate entries, there would obviously be no U.S. violation, and nothing for the U.S. to do anything with respect to other than report it to the flag state, which was already investigating this matter. The process here of taking over prosecution from the flag state has led to this system of foreigners being detained. I have the argument you wanted to move on to the next set of errors, so I don't mean to hold you up. Okay. Well, I'd be pleased to respond to any questions. I do want to emphasize that the district court found that it was undisputed that the government believed the plaintiffs got off the vessel voluntarily. And respectfully, Your Honor, that assertion, the government adopted an assertion by the government in response to our statement of additional facts and accepted it as true. It's highly disputed. We respectfully submit that, first of all, the agreement on security makes clear that the people who drafted it, the U.S. government, expect, and inevitably, the vessel will tell the crew members, you have to get off. The government insists that you get off. Government cites over and over again to a provision in the agreement that says you're only contractually obligated to ask, which is exactly what anybody writing a tortious contract to commit a tort or a wrong would always put in some caveat that I don't require you to commit a tort. But the key provision, Your Honor, is that the vessel agrees that none of the ship's officers or crew members will be allowed to remain on the vessel when it leaves. Coast Guard demands security, a couple million dollar bond, and nine people, and they insist that what the company gets is its vessel goes back to work, which, depending on the vessel, might be $20,000 a day and charter fees might be $100. They sign a contract, you can get your $100,000 a day, but only if these people get off. But you're only contractually obligated to ask them to get off. And we respectfully submit that no defendant, including the United States, can get summary judgment by saying, well, we just assume people get asked nicely and voluntarily get off. And then they say, oh, but except for Zach, we knew he didn't get off voluntarily because he had sued for his freedom the same day the agreement was signed and was forced off the vessel two days later before there were any proceedings in court on his suit. So how is it they thought everybody else was getting off voluntarily, whereas Zach, they knew, was not getting off voluntarily, but was getting off? One of your clients brought a habeas petition saying he was being kept on the ship improperly. And complaining about the agreement on security. But then when he was then allowed to get off the ship, he claimed that he shouldn't have been told to get off the ship. He contended that he was being detained on the ship improperly and that he was forced to get off and held here. So did he want to be on the ship or off the ship? He wanted to be, Mr. Zach is from the Slovak Republic, he wanted to, there's another error that the district court made, Your Honor, is that Mr. Zach had been given written permission to get off the vessel the day it arrived, July 7th, 2017. The next day, that permission, which is called the D2 entry visa or shore pass, was revoked. There's no statutory authority to revoke that shore pass. So what's the, what's the, this is an action under the Federal Tort Claims Act. Yes, and Bivens. What is the tort? Tort is false arrest, Your Honor. Okay, so the, and where did the arrest occur? The arrest occurred when his shore pass and permission to go home was revoked and he was then detained on the vessel. Okay, I'm having trouble understanding how that's an arrest. I picture someone showing up, say at a port of entry from Canada with a Canadian passport and they show it and ask to come into the U.S. and improperly, the border guard won't let them into the country and in violation of regulations, in violation of whatever. I wouldn't think of that as a false arrest of that Canadian citizen who's barred from coming into the country. And why would not letting one of your clients come from the ship into the U.S., why would that be a false arrest? As the record establishes, Your Honor, the government issued a form to the ship's agent that it was required to detain all three plaintiffs and everybody on the crew on the vessel. A guard was posted at the vessel by the United States government. They were mustered twice a day for attendance. Sure, that'd be like the Canadian, the border guards at the Canadian border or the southern border right now. A lot of people being prevented from coming into the United States, some of them wrongfully so. Those aren't false arrests. I respectfully submit, Your Honor, that if at the southern border, the government hired a private individual and said you must detain this person in a specific space and bring him through for attendance twice a day and not allow him to leave that space, that that would be a false arrest. Well, it was not allowed to enter the U.S. It's not allowed to get off the vessel. Well, because getting off the vessel would get into the U.S. I suppose getting off the vessel would be getting into the U.S. But in that sense, it is arrested. The court is suggesting that because he wasn't detained in a jail, if he was detained in a jail, he would be arrested. If he's detained on a vessel, he's not arrested. Respectfully, Your Honor, a person who is detained and told he cannot leave his confines and must attend. Sure, if this were in the U.S., I'm having trouble understanding how when you're calling detained, is it being a barred from entry? We're certainly not free to leave. There is an order that he has to stay on the vessel, that a private person, the ship's agent, has to make sure he stays on the vessel. There's a U.S. hired or employed guard at the bottom of the gangway. Is there any precedent for when the U.S. bars entry to someone, so therefore they have to stay wherever they are, ship, plane, Canada, that that's a false arrest claim? I don't believe there are cases where someone is simply told you cannot come into the United States if they're not entitled to entry, that that constitutes an arrest. But I don't know of any case that says in this context, where permission to come ashore and leave the country is revoked, and there's no statutory authority to revoke that permission. And then you're ordered to be detained in a specific place under guard and appear for attendance twice a day. We respectfully contend that there's no authority for the proposition that that's not an arrest. And it was highly disputed. The court below did not discuss Mr. Chalice's declaration or his email that expressly says, do not go to court and say these guys came here voluntarily. I'm the guy who signed this agreement on security. They are not here voluntarily. And yet the government contends, and the district court found, it's undisputed the government thought they were here voluntarily. That's mental state of the defendant, not appropriate for summary judgment and inconsistent with the record drawing. Let me ask you one question. You haven't discussed this. I know it's in the brief, but I just have curiosity. You have a Bivens claim that was dismissed, and you're appealing that. Yes, sir. How do you distinguish these facts? Because Bivens was an arrest without a warrant by federal officials. How is this like Bivens for this to survive? Your Honor, these three plaintiffs were arrested. And all of their movement from the ship to the Customs and Border Patrol offices and to the hotel were under the control of the United States government. Mr. Zack had permission to fly home. Mr. Hornoff. But it is different because in Bivens, individuals are arrested without a warrant. They're in the United States. This is, your clients are coming into the United States and there's customs, there's immigration. They have to go through that process. I think it's, isn't it very different from the Bivens scenario? There are some differences, your Honor. We respectfully submit that this all constitutes detention and arrest in the context of Bivens. And I would note, your Honor, that my clients did not come to the United States the way somebody coming here seeking entry comes to the United States. They are employees, crewmen on board a ship, which is expressly treated differently than anybody else approaching the United States. I guess they're like stewardesses would be a fair analogy. But other than that, they're here to deliver goods we ordered. You don't expect to go through an immigration process. There's nothing in the statutes that suggest that anybody in that process could just decide, hey, we want to keep these guys here whether they like it or not and not let them go on their way on the ship or return home to their families. But technically, the regulation, the way it is, which, you know, it would allow the Coast Guard and the U.S. Attorney's Office to proceed the way it did, am I correct? No, I don't think the regulations give any sense that, or the statutes give any sense that this could happen. There's a statute specifically on when a customs officer may revoke a D1 shore pass, which would let you come ashore and go to the bar. And they can revoke a D1 shore pass by statute in their discretion if they first determine that the crew member is not a bona fide crewman. In other words, he's a stowaway or some other way, not a crewman. Here, everybody on that vessel was malified, was the testimony at a deposition. They turned the opposite of bona fide into a verb. We just decided we want to hold them. We malified them. We deemed them not real crewmen, which obviously is fanciful, for the purpose of subjecting them to arrest. That's what we did. And at the very least, it's a triable question. And there's absolutely no authority for it. And then that's what the sections do more. If there's no authority, wouldn't they have sort of like a qualified immunity? It's not clearly established. If it's not clearly established, then you don't have a... There could be a violation, but they would be immune, at least in this instance. Well, so we contended that they're not qualifiably immune on the Bivens claim because it's a violation of the Fourth Amendment and a clear violation of the Fourth Amendment. What there's no authority for, when the statute says you have discretion to revoke a shore pass and detain somebody if you determine, if it is determined that they're not a bona fide crew member, it does not suggest or imply you have discretion to just say, I'd like to arrest this guy. I'll just declare him to be a malified crew member. That's what happened here. And there's no reading of that statute. But that would only apply, even that argument by the government, to Hornoff and Cordick. Zach had a D2 permit, permission to come ashore, go to the Portland International Jetport and fly back to the Slovak Republic. There's no authority under any circumstances to revoke that. Okay, thank you. Thank you. Thank you. May it please the court, Anne Murphy for the individual appellees and for the United States. Your Honors, I'd like to start where we ended because it's very, very important for the United States that the Customs and Border Protection's discretion over the crew members' shore visas be recognized. As I agree with Mr. McCall on something, and that's that the people who come as crew members don't expect to go through an immigration process. Congress is aware that we have a lot of people who arrive on ships, foreign flag ships, from literally all over the world. We don't know very much about them. They don't go through very much of a process. And yet we do want them to get off and go to the bar, just as Mr. McCall said. So there's a slight, almost a porousness at our border there for individuals who are going to be physically present in the United States, and we know very little about them. As a result of that, Congress made the entire shore pass process highly discretionary with Customs and Border Protection. When Mr. Zack was given a shore pass, a D2 shore pass, to get to the airport and leave, it didn't give him any rights to transit the U.S. That's still conditional on Customs and Border Protection, you know, keeping that, they're expressly revocable, keeping that available to him. And just to make the point really clear, Customs and Border Protection would use this exact same authority to revoke a shore pass if it issued shore passes routinely. And then somebody called in and said, there's a dirty bomb on that ship and one of the crew members is going to take it and blow up Boston Harbor. Well, you can certainly see why the U.S. would want to have that discretion. And you're clearly subsection A of the statute and the regulation gives great discretion as to whether to give a D1 permit or not. Correct. Apparently with no restraint whatsoever. The odd thing is when you look at the revocation provision, instead of just saying you can have the discretion, same discretion to revoke it as you had to grant it, it instead specifies two, on their face, conditions that appear rather limited. I agree with you, Your Honor. But the revocation provision 1282B does have the in his discretion language again about the immigration officer and it hooks back into that definition of the alien crew member in 8 U.S.C. 1101A15D1 in which Congress was extremely clear about the people who could be given these shore passes and they've got to be serving in good faith. So your textural argument would focus on the word crewman and then ask us by looking at the definition of crewman elsewhere in the statute, determine that once a ship has been taken out of its ordinary course and has been held for suspected violation, none of what we think of the crewman are any longer crewman for purposes of the D1 permit. That's part of the answer. It's also true that to get the permit, I think our view is that unlike some government benefits when once you've been given them, you have some kind of entitlement to them. These aren't like that. Zach doesn't have a right to transit the U.S. even if he has a D2 visa. It's revocable. Congress specifically made them revocable. They're not allowed to get them unless they're, quote, clearly and beyond doubt entitled to landing privileges. That's the implementing reg at 8 CFR 252.1C. Why do we need to decide whether the revocation of the D1 permit was or was not proper under D2 and therefore interpret D2 and do this reading? Does your argument actually hinge on us finding that it was a proper revocation to result in a false arrest? No, because you are absolutely correct. They're all at the border of the United States asking to come in and they have no right to come in. It was important to us that the court not think that the Customs and Border Protection when they issue a sure pass is issuing something that they then can't revoke if they need to. The district court understood that. The district court pointed out national security reasons. Here there were very good reasons for them to think that they would want to keep some of these people, that Customs and Border Protection would want to keep some of these people. And in this case, it wasn't necessarily for the security of the United States. But then what as to the D1 permits, why does the regulation go into such detail about substantively when they can be revoked and how they're revoked procedurally? What's the point of that if they have this broad discretion to revoke? Actually, the revocation regulation is quite small. It's 252.2 and it says revocation. A crew member whose landing permit is subject to revocation under the statute may be taken into custody by any immigration officer without a warrant of arrest and be transferred to the vessel of arrival. And then it talks about how it's the vessel's job to get this person home afterwards. It's not the United States' job. So it's not actually... I understand that Congress did specifically make a couple of conditions that need to be met before the permit can be revoked. But it also made it highly discretionary with Customs and Border Protection. And so you're saying even without revoking the permit, the discretion to keep them on the ship is freestanding? Absolutely. So that's just part of the government's... And this is one of the frustrating things about this case, Your Honor. We could have just kept the ship in port and we could have just kept the crew members on the ship. And that's what usually happens in similar scenarios, am I correct? Well, we usually try not to do that. But the reason is that it's better for the crew members and it's better for the criminal defendant, which if it's a corporate defendant, which gets its vessel back, it's better for the crew members because instead of being on a ship moored in a harbor somewhere, they're able to go to a hotel. They have all of their pay. There's transportation to the places they need to go. And they're in Maine in the summer. And so generally, the agreement provides... It provides that the vessel owner, although it's the criminal defendant and it's going to be the subject of the witness's testimony, we ask them to agree to help. If you look at the agreement itself, which is at the very back of the addendum, please talk to the crewman. Please do not retaliate against the crewman. Please encourage the crewman to testify truthfully in the case. And so the government's objective is to obtain voluntary compliance. And this is actually also almost exactly what this court asked for in the Mann case. You remember in that case, we had a juvenile defendant from Australia and she was being held with adults. So she wanted release from detention. And the government arranged for her to have a Rule 15 deposition taken and returned home. And this court said, nah, the criminal defendant's right to cross-examine the live witness. Far outweighs the witness's right in this circumstance. And government, what you should have done is try for a lesser kind of detention and specifically to make sure that the witness has maintenance. And then government, you keep her passport and ticket. And so this is more or less exactly the model that we follow, the model in Mann. And Mr. Chalos, after the crew members get off and his client has a significant interest in making sure that they never testify. You know, he's writing all these emails. Oh, they're detained. They never meant this. Don't go to court and say they're here willingly. While they're on the ship and the Coast Guard says, can we, you know, can we keep their passports? He says, oh, it's a dream come true. I've asked for that a million times. And we cite that in our brief. It's the, you know, the criminal defendant's interest change very much between the point where it wants to have an agreement so that it can have its ship back and the point where the ship has left. And then it has a much greater interest in making sure that those witnesses don't testify if they can possibly achieve that. So that's, it's frustrating because the government is really trying to use the lightest possible touch and to be accused of like using people as human collateral or surety or something is really just, it's what's not what's going on and it's offensive. So I'd like to talk just for a minute about the crimes because counsel was also very invested in that. Just to be absolutely clear, the United States is not prosecuting derivative offenses so that it can get it conduct on the high seas. Obviously, they would prefer to be taken care of by Liberia which doesn't even have criminal prosecutions for these things than the United States. But that's neither here than there. The crimes that are, that take place in U.S. ports are record-keeping crimes and that's not a trivial matter. Many, many ships come to the United States from all over the world. They're not here for very long. We have to rely on the accuracy of their record books. It's not only for marple violations, it's also for safety, it's for crew well-being, it's for the condition of the vessels and it's very important to the United States that those books be kept correctly. And as you know, the bulk of the actual guilty plea in this case was under 18 U.S.C. 1519. It's not a marple violation. That requires vessels, that requires anybody actually to keep accurate records if it's going to matter and affect the administration of something by the United States or an investigation by the United States. So these are squarely domestic crimes that the United States is absolutely entitled to prosecute. I don't want your Honours to feel thinking that that's not fair either. If the regulation for the D1 permits can be read and the D2 revocation can be read the way you say, that's a plausible reading, your client would have the ability to issue an interpretive regulation that would make that clear. Yes, I'm not sure that we have interpretive regs for this. Yeah, I mean, as I said, the fact that both parts of the statute make it discretionary and the fact that it's border control and all kinds of very bad things could happen at the border and because of the lack of actual immigration control, it's very important that Customs and Border Protection have that discretion. I'm just going to leave the Court with that thought unless you have further questions for me on it. Questions? Thank you. Thank you, your Honours. Thank you.